IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Theodore Kulas,<br>                    Plaintiff,<br><br>vs.<br><br>Michael J. Astrue,[1] Commissioner of<br>Social Security,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. CV 07-131-TUC-DCB (HCE)

**REPORT & RECOMMENDATION**

On March 16, 2007, Plaintiff filed the instant *pro se* action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).   On that same date, Plaintiff's case was referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to the Rules of Practice of this Court.

On November 16, 2007, Plaintiff filed an Opening Brief (Doc. No. 13) (hereinafter "Plaintiff's Brief"). On December 26, 2007, Defendant filed his Response (Doc. No. 16) (hereinafter "Defendant's Brief"). For the following reasons, the Magistrate Judge recommends that the District Court deny Plaintiff's request for benefits and dismiss this action.

---

[1]On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as the defendant in this action.

I.      PROCEDURAL HISTORY

On March 12, 2004, Plaintiff submitted to the Social Security Administration (hereinafter "SSA") an application for supplemental security income under Title XVI of the Social Security Act alleging inability to work since December 12, 2002, due to "advanced hepatitis C liver disease with severe arthralgia (all joints on left side) severe, constant mental and physical fatigue, encephalopathy."  (TR. 186-188, 197)  Plaintiff's application was denied initially and on reconsideration. (TR. 55-59,61-64)

Plaintiff then requested a hearing before an administrative law judge and the matter was heard on May 2, 2005 by ALJ Lauren R. Mathon  (hereinafter "the ALJ") who denied Plaintiff's claim.  (TR. 45-47, 66, 517-540)    Thereafter, the Appeals Council granted Plaintiff's request for review and remanded the matter to the ALJ for further proceedings. (TR. 75, 116-119)  On remand, a hearing was held before the ALJ on April 7, 2006 wherein Plaintiff, unrepresented by counsel, and a medical expert testified.  (TR. 541-593) After  the hearing, the ALJ submitted interrogatories to vocational expert (hereinafter "VE") Staci Schonbrun. (TR. 15, 260-267) On September 29, 2006, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act. (TR. 15-19)

Plaintiff requested that the Appeals Council review the ALJ's decision.  (TR.11) On January 12, 2007, the Appeals Council, after considering additional evidence in the form of an October 2006 letter submitted by Plaintiff, denied Plaintiff's request for review thereby rendering the ALJ's September 29, 2006 decision the final decision of the Commissioner. (TR. 7-10)  Plaintiff then initiated the instant action.

I.      THE RECORD ON APPEAL

      A.      Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on October 8, 1949.  (TR. 186)  Plaintiff is unmarried and has two grown children who do not live with him.  (TR. 523)  At the time of the May 2005 hearing, Plaintiff testified that since July 2004 he had lived  "with a lady who essentially lets me live for free as a charitable act or a contribution."   (TR. 522) Prior to that, he had lived at a

rehabilitation facility/halfway house upon his February 2004 release from prison.  (TR. 522-523, 189) Plaintiff had been incarcerated at the Arizona Department of Corrections from 1993 until 2004.  (TR. 189)

Plaintiff has a GED certificate and completed courses at a community college where he earned a "business skills advanced" certificate.  (TR. 523) Plaintiff's work history includes employment for one month in 2004 as a driver.  (TR. 524-525) Additionally, from May 1976 to September 1986, he worked as a language professor/tutor teaching English and Spanish as second languages.  (TR. 198) He did not work between 1993 and 2004 because he was in prison for drug offense convictions.  (TR. 524-525)

Plaintiff has hepatitis C and has had difficulty finding a doctor to treat him because "I am supposed to be a non-responder and I'm over 40, and a high viral load."  (TR. 527) He began seeing Dr. Mezher in March 2004.  (Id.)  In December 2004, Dr. Mezher began treating Plaintiff with Interferon. (Id.)  This treatment involved weekly injections and five oral tablets taken daily and lasted 48 weeks.  (TR. 528, 537) According to Plaintiff, medical literature indicates that there is a "40 or 45" percent possibility of sustained viral response to this treatment.  (TR. 536)  Prior to taking Interferon, Plaintiff experienced arthralgia (severe joint pain) which  which made it difficult for him to walk, hold cups, and limited his range of movement.  (TR. 530) At the May 2005 hearing, he testified that  "[b]ecause the Interferon treatment is working, and the liver is improving,...[t]he pains, the arthralgias, has reduced somewhat, and it is not as bad as it used to be, and so I can pick up a cup now and...the old debilitating symptoms of [h]epatitis have now been reped by the symptoms and effects of the Interferon." (Id.)  He also testified at the May 2005 hearing that he experiences side effects from the Interferon treatment including blurred vision, stinging in the eyes, light sensitivity, headaches, diarrhea several times a week, fatigue after as little as ten minutes of activity or walking two blocks, dizziness, nausea, and loss of appetite.  (TR. 528-529) At times, he was so fatigued that he could not get out of bed and had to use a bed pan or crawl to the bathroom.  (TR. 533)

In May 2005, Plaintiff also testified about experiencing back pain that made it difficult to turn and bend and which was worse some days than others.  (TR. 530)  Dr. Mezher told him that the pain "is going to go away and that it is normal...."  (Id.)

By the time of the April 2006 hearing, Plaintiff had completed Interferon treatment and was experiencing autoimmune reactions, rashes, burning and peeling skin, psoriasis, and nausea.  (TR. 586-587)  He also had particulates in his lungs which caused coughing and phlegm. (TR. 587)  He was no longer taking tulose.  (TR. 459)

Plaintiff also wears hearing aids in both ears which makes his hearing "close to normal."  (TR. 549)

In the past, Plaintiff was treated by Dr. Wilson at El Rio Clinic.  (TR. 531)  However, he discontinued treatment with Dr. Wilson due to a "misunderstanding...there is no trust in the doctor/patient relationship."  (Id.)

In 2004, Plaintiff went to Cope Behavioral Services as part of the conditions of his release.  (Id.)  He no longer goes to Cope because he completed the parole requirements.  (Id.)  He still experiences memory problems, becomes disoriented, and loses track of what day it is.  (TR. 532-533)

In his April 2004 Activities of Daily Living Questionnaire, Plaintiff stated that he suffers from extreme pain, dizziness, and inability to function mentally or physically on a daily basis.  (TR. 210)  He is unable to lift, clean and has limited ability to move.  (Id.)  He is unable to assist with house cleaning because of joint swelling and pain and dizziness and confusion caused by encephalopathy.  (TR. 210-212)  He cannot wash dishes because he cannot stand longer than 20 minutes and he is unable to use his arms.  (TR. 211)  He shops for about ten minutes biweekly.  (Id.)  He cannot walk more than 200 yards and cannot run.  (TR. 212)  In July 2004, he stated that self care activities such as brushing his hair or teeth were very painful.  (TR. 227)  He was unable to sit for long periods and had difficulty sleeping due to pain.  (TR. 229)  He attributed the debilitating pain to arthralgia.  (Id.)

B.      Medical Evidence

      1.      Plaintiff's Treating Physicians

           a.      Physical Ailments

In 2001, Plaintiff was diagnosed with hepatitis C.  (*See* TR. 432)  Medical records from the Arizona prison reflect that Plaintiff suffered from hepatis C and epididymitis.  (*See e.g.,* TR. 107-108, 337)  In December 2002 and August 2003 prison doctors restricted Plaintiff from working.  (TR. 300, 334)

Additionally, while in prison, Plaintiff was underwent audiological evaluation in April 2003 by Tommy J. Cattey, Au.D., clinical audiologist.  (TR. 330-331)  Au.D. Cattey noted that Plaintiff was "uncooperative and inconsistent with his auditory responses. Consequently, the evaluation results are rather inconsistent and producing less diagnostic information...it is becoming increasingly difficult to make an auditory diagnosis."  (Id.)  Au.D. Cattey believed that Plaintiff was "exaggerating his auditory difficulties."  (Id.)  Au.D. Cattey diagnosed bilateral severe to profound mid-to-high frequency sensorineural hearing loss. (Id.)  He opined that Plaintiff's hearing of speech and clarity for understanding of speech was bilaterally normal.  (Id.)  Although Plaintiff could experience auditory difficulty in an environment with high ambient noise, Au.D. Cattey did not believe hearing aids would sufficiently benefit him.  (Id.)

A June 13, 2003 medical record by C. Allen, C.R.N., reflects Plaintiff's medical history as: peptic ulcer disease, decreased visual acuity, bilateral hearing loss (used hearing aids), hepatitis C virus, hepatitis A virus, hypospadia, thoracic spine degeneration, past history paranoid personality disorder, delusional disorder, and manic-depression.  (TR. 327)

On October 1, 2003, David A. Saltzman, M.D., examined Plaintiff.  (TR. 345)  At that time Plaintiff was taking tulose for hepatitis.  (TR. 346)  Dr. Saltzman noted Plaintiff's past history of hepatitis B and D, but also noted that Plaintiff did not have chronic hepatitis B or D.  (TR. 345)  Dr. Saltzman diagnosed hepatitis C with very high levels of virus, 1A genotype, which is a less favorable genotype for therapy.  (Id.)  At that time, Plaintiff did not

have ascites, asterixes or icterus.  (Id.)  On physical examination of Plaintiff, Dr. Saltzman found no stigmata of chronic liver disease.  (Id.)  Although Plaintiff reported a tender hepar, it was not large.  (Id.)  Because test results showed an increased serum ammonia level, Dr. Saltzman "strongly suspect[ed] that ...[Plaintiff] has gone beyond the chronic hepatitis C stage to cirrhosis, his increased ammonia...reflects either, encephalopathy of the liver or shunting of blood around a cirrhotic liver.  In any case, it is far advanced liver disease and one can argue whether this reflects hepatic decompensation.  In my view, it does reflect some element of decompensation, particularly 'as an' element of encephalopathy, even though the patient does not have frank icterus, asterixis or ascites at this time."  (Id.)

Dr. Saltzman recommended a liver profile, a CT scan, and a liver biopsy.  (TR. 345-346) Therapy would be dependent on the test results.  (TR. 346)

Dr. Saltzman also noted that "[t]his is a very difficult situation."  (Id.)  He further stated that although he was not a psychiatrist some of Plaintiff's comments could be interpreted as  "being 'paranoid.'"  (Id.)  Dr. Saltzman recommended that Plaintiff also be evaluated by a psychiatrist "to see his overall mental status and were we [sic] start therapy, that the psychiatrist continue along following the patient and perhaps putting him on some medications, which he is not on at the present time."  (Id.)

In October 2003, the prison approved referral of Plaintiff for an abdominal CT scan. (TR. 324)  The reason for the referral was: "end-stage liver disease 2 [illegible] Hep C."  (Id.) A December 2003 CT scan showed Plaintiff's liver was normal in size and contour.  (TR. 343) The impression was: "Negative CT scan of abdomen and pelvis, triphasic examination. Specifically, no hepatic lesions were seen."  (Id.)

In December 2003, Dr. Saltzman noted that Plaintiff's CT scan "was entirely within normal limits.  His clotting factors were entirely normal.  Alpah fetoprotein is...normal." (TR. 341) He recommended a biopsy.  (Id.)

In March 2004, Plaintiff was treated by MaryLou Leitner, F.N.P. for epididymitis. (TR. 382) F.N.P. Leitner also noted that Plaintiff's liver function tests were elevated and his

BUN was elevated.  (TR. 95) In April 14, 2004, F.N.P. Leitner reported that Plaintiff's lab results were normal except for an elevated BUN and "a borderline elevated SGOT." (TR. 365) On physical exam that same day, his liver was barely palpable.  (Id.)  Assessment was BUN elevation, epididymitis, and liver cirrhosis.  (Id.) Plaintiff continued on Lactulose.  (Id.)

April 30, 2004 liver biopsy results indicated mildly active chronic hepatitis C.  (TR. 442) Using the modified Knodell scoring system for chronic hepatitis, the following score was assigned: piecemeal necrosis, 1 point; portal inflammation, 3 points; lobular inflammation, 1 point; total inflammatory score, 5 points, mild inflammation; fibrosis, mild (portal fibrosis)."  (Id.)  The findings were discussed with Scott Wilson, M.D.  (Id.)

On May 3, 2004, Plaintiff presented to Dr. Wilson with complaints of fatigue and arthralgia.  (TR. 360)

On May 10, 2004 Plaintiff reported right-sided joint pain and swelling of the right testis to F.N.P. Leitner.  (TR. 358) She noted that Plaintiff's liver disease was at "0.1, stage 1."  (Id.)  Plaintiff wanted to begin Interferon treatments.  (Id.) F.N.P. Leitner indicated that Dr. Wilson wanted a psychiatric evaluation of Plaintiff before beginning Interferon treatment but Plaintiff did not feel the evaluation was necessary.  (Id.)  On physical exam, Plaintiff's liver was barely palpable, his joints were not tender, swollen or deformed.  (Id.)  Lab results indicated his ammonia level was 32.  (Id.)  F.N.P. Leitner gave Plaintiff Celebrex and ordered a urine culture.  (TR. 359) She also ordered an eye exam because Plaintiff stated he was legally blind.  (Id.)

A May 2004 testicular ultrasound was normal.  (TR. 387)

In June 2004, Dr. Wilson prescribed Cipro and diagnosed "[illegible] prostatitis." (TR. 352)

In August 2004, Dr. Wilson refused to complete a Medical Source Statement of Ability To-Do Work Related Activities (Physical) because Plaintiff "has not completed requested tests."  (TR. 407)

In September 2004, Plaintiff began treatment with Raymond Bakotic, D.O., who referred Plaintiff to Bechara Mezher, M.D., for consultation regarding Interferon treatment. (TR. 473, 433-434). That same month, Dr. Mezher, noted that Plaintiff's liver biopsy showed mild portal fibrosis; his viral load was 8,820,000 IU/ML; alpha-fetoprotien is 3.1, genotype is 1a; and most recent liver function tests were ATL 66, AST 39, INR 1.5. (TR. 433) Dr. Mezher also noted that Plaintiff was taking Codeine, Lactulose, and Ciprofloxacin. (TR. 432)

In December 2004, Dr. Mezher began treating Plaintiff with Interferon, also referred to by Dr. Mezher as pegysus treatments. (TR. 430) Also in December 2004, Plaintiff complained to Dr. Bakotic about tenderness "in all" joints. (TR. 470) Dr. Bakotic assessed hepatitis C, nausea, fatigue, and vertigo. (Id.) He continued Plaintiff on Codeine. (Id.)

On January 3, 2005, after four weeks of Interferon treatment, Plaintiff was "doing relatively well," although he complained of fatigue and intermittent nausea. (TR. 427) Dr. Mezher saw no depressive symptoms. (Id.) Dr. Mezher noted that the nausea was likely related to the treatment and he prescribed Phenergan. (Id.) Also, in January 2005, Dr. Bakotic, who had seen Plaintiff monthly, noted Plaintiff's complaints of abdominal pain. (TR. 469; *see also* TR. 470-472) On January 24, 2005, Dr. Mezher noted Plaintiff's complaints of discomfort in his lower back on both sides. (TR. 426) Physical exam of the abdomen revealed "no appreciated hepatospelnomegaly, no palpable masses" and lab results were "unremarkable" except for a slight decrease in white blood cells. (Id.) Dr. Mezher stated that Plaintiff "continues to do well" except for low back discomfort. (Id.)

In February 2005 and March 2005, Dr. Bakotic assessed GERD and abdominal pain. (TR. 468, 466) He prescribed Hydrocodeine and Codeine. (Id.) Also, in March 2005, Dr. Mezher wrote that Plaintiff had completed 12 weeks of Interferon treatment and "[h]e continues to do well except for complaints of fatigue, nausea and back pain. He denies any depressive symptoms, rashes or other complaints." (TR. 425) His viral load remained undetectable. (Id.) In May 2005, Plaintiff complained to Dr. Mezher about "significant

- 8 -

fatigue, weight loss, and inability to work adequately." (TR. 454) On physical exam, Plaintiff exhibited no abdominal pain, no palpable masses, and no appreciated hepatosplenomegaly. (Id.) Lab results showed a mild decrease in his CBC indices. (Id.) Dr. Mezher's assessment indicated that Plaintiff had completed 22 weeks of Interferon treatment "with no major side effects." (Id.)

On May 11, 2005, Dr. Bakotic completed a Request for Medical Information form wherein he checked boxes indicating that Plaintiff had "a physical or mental incapacity which prevents him...from performing any substantially gainful employment"; and that it was his medical opinion that Plaintiff had "a medical impairment which is expected to result in death OR which has lasted or can be expected to last for a continuous period of not less than 12 months." (TR. 105) Dr. Bakotic stated that Plaintiff suffered from chronic active hepatitis C, "[o]ver 1 yr abnormal prothrombin time..Encephalopathy." (Id.)

On July 28, 2005, Kenneth Snow, D.O., examined Plaintiff's eyes on referral from Dr. Bakotic for complaints of flashing lights, floaters, decreased peripheral vision, and dimness. (TR. 475) Dr. Snow's impression was incipient cataracts. (Id.) He advised observation and follow up in six months. (Id.)

In August 2005, Dr. Mezher's consultation note reflected that Plaintiff "continues to do well with no significant side effects except some fatigue." (TR. 453) Plaintiff's lab results "remain in the acceptable range." (Id.)

In December 2005, Plaintiff saw Kenneth Belkoff, D.O., a urologist. (TR. 474) Physical examination revealed a grade II benign prostate. (Id.) Plaintiff's most recent PSA was 1.5 (Id.) Dr. Belkoff recommended follow up in six months. (Id.)

The record reflects that Plaintiff saw Dr. Bakotic monthly since September 2004. (*See* TR. 459, 461-466, 468-472, 558) Dr. Bakotic regularly prescribed Codeine or MSContin for pain. (Id.) In some instances he noted Plaintiff's complaints of fatigue. (*See e.g.* TR. 459 (461-462 (June & July 2005); TR. 459 (September 2005))

b.      Mental Ailments

A June 5, 2003 medical record generated while Plaintiff was in prison indicated that Plaintiff was paranoid and delusional but he would not be treated by the prison's mental health staff because of his refusal of treatment and his violent demeanor toward staff.  (TR. 313) Additionally, in October 2003, Dr. Saltzman noted "inappropriate" comments made by Plaintiff that were suggestive of "the patient...being 'paranoid'."    (TR. 346) He recommended a psychiatric evaluation.  (Id.)

May 2004 records reflect that Dr. Wilson directed Plaintiff "to have a psychiatric evaluation before" beginning Interferon.  (TR. 358) Plaintiff indicated to F.N.P. Leitner that such evaluation was unnecessary.  (Id.)  In July 2004, Dr. Wilson noted that Plaintiff had seen a psychiatrist who concluded that Plaintiff did not have a psychiatric diagnosis.  (TR. 351)

In 2004, Plaintiff reported to Cope Behavioral Services as a term of his parole.  (TR. 479-493, 531) The March 2004 intake form, completed by Sharon Duckworth, C.M.S.W., indicates, in pertinent part: Axis 1: "309.4 Adjustment Disorder Chronic, 304.00 Opoid [sic] Dependence in Full Remission of controlled environment"; and Axis II: 301.9 Personality Disorder NOS.  (TR. 483) Plaintiff's global assessment of functioning score (hereinafter "GAF score") was 51.  (Id.) C.M.S.W. Duckworth noted that Plaintiff was:

> argumentative and has many grievances with the world...Client used intake to argue his views on the world.  Client refused to sign certain paperwork and did not complete the surveys.  Client will have trouble fitting back into the general population and pretends to be social in nature but lacks mature, developed social and emotional skills.

(Id.)   Additionally, Plaintiff "did not present as depressed no [sic] did he exhibit any symptoms of generalized anxiety."  (Id.)  Plaintiff reported he was not depressed and that he no longer used "mood altering substances.  Client reports a past addiction to Heroin."  (Id.)

A June 2004 Cope service note reflects that Plaintiff refused a psychiatric session. (TR. 482) A July 2004 Cope service note  reflects that the provider, whose name is illegible, indicated a GAF score of 85, found "no psych problems or dx [i.e. diagnosis] or need" for

medication even in the event Plaintiff began Interferon treatment.  (TR. 406)  Plaintiff's Cope
file was closed that same month with an indication that his treatment was complete.  (TR.
479-480)

2.      Non-Examining State-Agency Physician

On May 13, 2004, psychologist Paul Tangeman, Ph.D., completed a Psychiatric
Review Technique form wherein he indicated he was unable to make a determination due to
"[i]nsufficient [e]vidence".  (TR. 392)

On September 13, 2004, Hubert R. Estes, M.D., also indicated that he was unable to
make a determination due to  "[i]nsufficient [e]vidence".  (TR. 409)

The record also reflects that Social Security examiners requested Plaintiff to submit
to physical and mental examinations by agency-consulting physicians.  (TR. 292)  Although
Plaintiff initially agreed to such examinations, he later refused.  (Id. (Plaintiff indicated
agency "should have enough in the file to make a good determination"); TR. 280 (Plaintiff
stated "he was not crazy" and he did not need a psychological examination because his
disability was "strickly [sic] physical")).

At the April 7, 2006 hearing, Charles Bahn, M.D., who is board eligible[2] in internal
medicine and gastroenterology, testified as a medical expert.  (TR. 547-548)  Dr. Bahn has
treated 300 to 500 patients with hepatitis C.  (TR. 558)  Dr. Bahn testified that Plaintiff had
mild chronic active hepatitis C with fibrosis, cell necrosis and inflammation to a mild
degree.[3]   (TR. 551, 560)  The records did not reveal whether Plaintiff's cell necrosis and
inflammation persisted for longer than three months.  (TR. 560)  The records did show that

_____

[2]Board eligible means that Dr. Bahn has "fulfilled all the requirements in that
speciality in Internal Medicine and Gastroenterology that would...satisfy requirement in those
two fields."  (TR. 557-558)

[3]Dr. Bahn testified that an April 30, 2004 biopsy report indicated Plaintiff had mild,
active, chronic hepatitis C.  (TR. 563-564)  Dr. Bahn also testified that the April 2004 report
"shows preserved hepatic architecture.  In other words, that means it's still in reasonably
good shape, preserved hepatic architecture."  (TR. 565)

with the Interferon treatment, Plaintiff's cell lode decreased and his liver function improved.[4] (TR. 561-562) Plaintiff also suffers from hyperlipidemia, bilateral hearing loss improved with hearing aid, benign prostatic hypertrophy (an enlarged prostate), gastro esophageal reflux disease, chronic adjustment disorder, and personality disorders.  (TR. 551-553) Although degenerative disc disease in the thoracic spine was described, the record did not contain x-rays or other reports to substantiate this diagnosis.  (TR. 551-552) Nor were there records to substantiate that Plaintiff had chronic obstructive pulmonary disease.  (TR. 552) Dr, Bahn concluded that Plaintiff's conditions when considered either individually or in combination did not meet a listing that would establish disability.  (TR. 553) Plaintiff's impairments have not precluded him from maintaining full time work for any period of time, twelve months or greater, between March 1, 2004 and the date of the April 2006 hearing. (TR. 557)

Dr. Bahn recommended that Plaintiff, due to hearing problems, avoid working in an environment with loud noises, unprotected heights and open machinery.  (TR. 554-555) He should also avoid working around chemicals and fumes "because of the reference to his lung...."  (TR. 555) Plaintiff would also have difficulty working in a situation that was stressful or involved deadlines such as automation or assembly line work.  (Id.)  Dr. Bahn found no lifting, standing or sitting restrictions.  (Id.)

Dr. Bahn disagreed with Dr. Bakotic's opinion that Plaintiff was unable to work.  (TR. 556) Dr. Bahn stated the "the objective evidence from the various exhibits" allowed him to determine that Plaintiff did not meet a listing.  (Id.)  Additionally, Dr. Bahn found that Dr.

_____

[4]Additionally, a lab report from June 2003 indicated that Plaintiff's  liver functions were all within normal range.  (TR. 567-568)   Although Dr. Bahn initially testified that an October 21, 2003 report showed  prothrombin time to be within normal limits, he later agreed with Plaintiff that the test showed a low prothrombin time indicating an abnormal reading. (TR. 569-570) Dr. Bahn further explained that, although the result was "technically" abnormal, it was not a significant difference from normal given that a normal reading "is up to 12.8" and Plaintiff's result was 12.9.  (TR. 573, 575)An April 5, 2004 report indicated prothrombin time was at normal levels.  (TR. 572)

Bakotic's opinion was conclusory in nature and not supported by the objective evidence. (TR. 556-557)

      C.     Vocational Expert Testimony

After the April 2006 hearing, the ALJ submitted interrogatories to VE Staci Schonbrun. (TR. 263, 265-267) VE Schonbrun identified Plaintiff's past relevant work as a language professor, Dictionary of Occupational Titles (hereinafter "DOT") Number 090.227-010, as light skilled work. (TR. 263) Such occupation requires skills in education, research, and Spanish. (Id.) Questions were posed to VE Schonbrun based upon the following hypothetical situation:

> Assume a Residual Functional Capacity for unlimited exertional work, reduced by the inability to work with loud noises, the inability to work with the hazards of unprotected and open machinery, the inability to work in a toxic environment with chemicals and fumes, and the inability to work under the stressful conditions of deadlines, such as automation or assembly lines.

(TR. 266) VE Schonbrun stated that the above-stated residual functional capacity would allow Plaintiff to perform his past relevant work as a language professor. (TR. 263)

Assuming a residual functional capacity for light work, reduced by the inability to complete a normal work week due to fatigue, nausea, abdominal pain and intestinal troubles, Plaintiff would not be able to perform his past relevant work. (TR 263, 267) Additionally, he could not maintain any employment if he were unable to complete a normal work week on a regular basis. (Id.)

      D.     The ALJ's Findings

          1.     Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process. 20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of whether the claimant is engaged in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b). If so, then the claimant is not disabled under the Act and benefits are denied. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination

of whether the claimant has a medically severe impairment or combination of impairments. 20 CFR §§ 404.1520(c)), 416.920(c)).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id.*  If the ALJ concludes that the impairment is not severe, the claim is denied.  *Id.*  If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.   20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[5] to perform past work.   20 CFR §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.   *Id*. However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 CFR §§ 404.1520(f). 416.920(f).  At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).  The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations.  *Heckler v.*

---

[5]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR § 404.1545, 20 CFR 416§945.

*Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.  *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five.  *Desrosiers,* 846 F.2d at 580.

> 2.     The ALJ's Decision

In her June 1, 2005 decision, the ALJ found that Plaintiff's "medically determinable impairments include hepatitis C and a poor memory.  Though the interferon treatment that began December 2004 has caused symptoms of fatigue and nausea, the claimant should be able to work without limitations by December 2005."  (TR. 46) Therefore, the ALJ determined that because Plaintiff's did not "meet the 12-month durational requirement necessary to qualify as 'severe' under the Social Security Act", he did not qualify for benefits.  (TR. 46-47)

Thereafter, the Appeals Council remanded the matter, *inter alia,* for further evaluation of Plaintiff's subjective complaints and mental impairment and for additional evidence concerning Plaintiff's impairments.  (TR. 117-119)

In her December 12, 2005 decision issued after remand and re-hearing, the ALJ made the following findings:

1.     The claimant has not engaged in substantial gainful activity since December 1, 2001, the alleged onset date (20 CFR 416.920(b) and 416.971 *et. seq.*).

2.     The claimant has the following severe combination of impairments: hepatitis C, hyperlipidemia, bilateral hearing loss (corrected with hearing aids), degenerative thorarcic disk disease, chronic adjustment and personality disorders, chronic obstructive pulmonary disease, gastroesophageal reflux disease, benign prostrate [sic] enlargement (20 CFR 416.920(c)).

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to work at all exertional levels reduced by the need to avoid loud noises in the workplace, unprotected heights, toxic environments (chemicals and fumes) and jobs that require strict deadlines, such as automation and assembly.

5.     The claimant is capable of performing past relevant work as a language professor.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 CFR 416.965).

6.     The claimant has not been under a "disability," as defined in the Social Security Act, since March 1, 2004 (20 CFR 416.920(f)), the date the application was filed.

<u>DECISION</u>

Based on the  application for supplemental security income protectively filed on March 1, 2004, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(TR. 15-19)

In reaching her decision, the ALJ accorded significant weight to medical expert Dr. Bahn.  (TR. 19)   She gave less weight to treating Dr. Bakotic's opinion that Plaintiff was unable to work. (Id.)

Additionally, the ALJ stated that although Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms...the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (TR. 18)

IV.     DISCUSSION

A.     Argument

Plaintiff argues that he meets the disability listings and that the ALJ improperly relied upon non-examining Dr. Bahn's testimony over treating Dr. Bakotic's opinion.  He also argues that the "substantial evidence" standard and admission of Dr. Bahn's testimony was unconstitutional.  He requests remand for an immediate award of benefits.

- 16 -

Defendant asserts that Plaintiff does  not meet a listing and that the ALJ's reliance on Dr. Bahn's testimony was proper.  Defendant also asserts that Plaintiff's constitutional arguments are conclusory and, therefore, do not merit review.

B.     Standard of Review

An individual is entitled to Title XVI Supplemental Security Income disability benefits (hereinafter "SSI") if he or she meets certain eligibility requirements and demonstrates the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 1381(a), 1382c(a)(3)(A).  "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'"  *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).  Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error."  *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision.  *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)).  Substantial evidence is defined as such relevant evidence which a reasonable

mind might accept as adequate to support a conclusion.  *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988).  However, substantial evidence is less than a preponderance.  *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly.  *Id.*  However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly.  *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975).  Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion.  *Id.* at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight.  *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989).  However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability.  *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or non-examining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record.  *Magallanes,* 881 F.2d at 751.  Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so.  *Magallanes*, 881 F.2d at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner.  *Magallanes,* 881 F.2d at 751 (citations omitted).  However, the Commissioner's finding that a claimant is less than credible must have some support in the record.  *See  Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

C.        Analysis

1.        The Listings

Plaintiff, citing to exhibits attached to his Complaint, argues that he meets or equals Listing 5.05(F)(3). (Plaintiff's Brief, p.6) To establish presumptive disability under the listings, the claimant bears the burden of proving that his impairment, or combination of impairments, satisfies all the criteria in the listing. *See Sullivan v. Zebley,* 493 U.S. 521, 530 (1990), *superseded by statute on other grounds*. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* In order to "equal" a listing, the claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment. *Tackett v. Apfel,* 180 F.3d 1094, 1099 (9th Cir. 1999).  Furthermore, medical equivalence must be based on medical findings, which are supported by medically accepted clinical and laboratory diagnostic techniques.  *Id.* at 1100.  "If a claimant suffers from multiple impairments and none of them individually meets or equals a listed impairment, the collective symptoms, signs and laboratory findings of all the claimant's impairments will be evaluated to determine whether they meet or equal the characteristics of any relevant listed impairment." *Id.*

a.        New Evidence

Among the exhibits attached to Plaintiff's Complaint is a November 8, 2006 Medical Statement from Dr. Bakotic indicating that Plaintiff is unable to work and has a medical impairment which is expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  (Complaint, p. 25) Dr. Bakotic further stated that Plaintiff has "active chronic hepatitis C, advanced with liver biopsy and abnormal PT and enzymes at least 5 months, with edema, dizziness, vomit [sic], nausea, joint pain." (Id.)   On October 4, 2006, Dr. Bakotic also completed a Medical Work Tolerance Recommendations form wherein he indicated many restrictions which became effective as of March 2001. (TR. 26-27)

- 19 -

The record reflects that Dr. Bakotic's October and November 2006 statements were not submitted to the ALJ or the Appeals Council. (*See e.g.* TR. 7-10)  Defendant does not discuss Dr. Bakotic's 2006 opinions.

The Court may remand a case to the Commissioner for consideration of new evidence when the plaintiff demonstrates that there is: (1) new evidence that is material; and (2) good cause exists for his failure to incorporate that evidence into the administrative record. *Sanchez v. Secretary,* 812 F.2d 509, 511 (9th Cir. 1987) (*citing Allen v. Secretary,* 726 F.2d 1470, 1472 (9th Cir. 1984)); 42 U.S.C. § 405(g)).

To satisfy the materiality requirement, Plaintiff must show "that the new evidence is material to and probative of his condition as it existed at the relevant time –at or before the disability hearing."  *Sanchez,* 812 F.2d at 511 (*citing* 42 U.S.C. §416(i)(2)(G)).

Dr. Bakotic's November 2006 is set out on a form identical to the form containing his May 2005 opinion.  However, his opinion differs from one form to the other.  In May 2005, he stated Plaintiff had abnormal prothrombin time results for over one year and he did not address Plaintiff's enzyme results.  (TR. 105) In November 2006, Dr. Bakotic stated that Plaintiff had abnormal prothrombin time and enzyme results for "at least 5 months." (Complaint, p. 25)  Because Dr. Bakotic does not identify the specific lab results that support his conclusion, it is unclear whether his opinion would have involved information concerning Plaintiff's condition at or before the disability hearing and/or sometime thereafter.  As to October 2006 work restrictions, Dr. Bakotic indicates such restrictions were effective as of March 2001 and, thus, they are material to Plaintiff's disability at the time of the hearing before the ALJ.  (Complaint, p. 27) However, such restrictions are necessarily redundant given that Dr. Bakotic's May 2005 opinion, which  was submitted to the ALJ, indicated Plaintiff was unable to work and the 2006 restrictions are consistent with that opinion. Nonetheless, giving Plaintiff the benefit of the doubt, the Court concludes that the records are material.

With regard to the good cause requirement, "[i]f new information surfaces after the [Commissioner's] final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding, the good cause requirement is satisfied." *Key v. Heckler,* 754 F.2d 1545, 1552 (9th Cir. 1985). However, "[a] claimant does not meet the good cause requirement simply by obtaining a more favorable report from an expert witness once his claim is denied...The claimant must establish good cause for not seeking the expert's opinion prior to the denial of his claim." *Clem,* 894 F.2d at 332 (*citing Key,* 754 F.2d at 1551). Plaintiff herein alleged hepatitis C at the time of the hearing before the ALJ. Plaintiff has been treated by Dr. Bakotic since September 2004 and has seen him on a regular basis since that time. Plaintiff provides no explanation why he did not submit Dr. Bakotic's opinions earlier.

The Ninth Circuit has refused to find good cause and, thus, has declined to remand cases for consideration of new evidence where, like here, the plaintiff offered no reason why he could not have obtained the evidence earlier. *Id.* at 332-333 (*citing Key,* 754, F.2d at 1551; *Allen,* 726 F.2d at 1473). Because Plaintiff herein offers no explanation why the evidence could not have been obtained earlier for use by the Commissioner, Plaintiff failed to meet the good cause requirement. *Id.* Consequently, remand for consideration of Dr. Bakotic's 2006 opinions (attached to Plaintiff's Complaint) is not appropriate in this case.

b.     Evidence before the ALJ

Listing 5.05(F)(3) requires:

Chronic Liver disease (e.g. portal postnecrotic or biliary cirrhosis; chronic active hepatitis; Wilson's disease). With...
***
F. Confirmation of chronic liver disease by liver biopsy (obtained independent of Social Security disability evaluation) and one of the following:
     ***

3.  Hepatic cell necrosis or inflammation persisting for at least 3 months, documented by repeated abnormalities of prothrombin time[6] and enzymes indicative of hepatic dysfunction.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 5.05(F)(3) (hereinafter "section 5.05(F)(3)").

The ALJ concluded that Plaintiff did not meet or equal a listed impairment.  (TR. 18) She pointed out that "[n]o treating, examining or non-examining physician indicated findings that would satisfy the severity requirements of any listed impairment.  Similarly, the medical expert [Dr. Bahn] testified that none of the claimant's impairments, singly or in combination, satisfy the requirements of any listed impairments."  (Id.)  In accepting Dr. Bahn's opinion, the ALJ rejected treating Dr. Bakotic's opinion that Plaintiff was disabled.  (TR. 19)

In May 2005, treating Dr. Bakotic stated that Plaintiff was unable to work for a period of not less than 12 months due to: "chronic active hep. C.  Over 1 yr abnormal prothrombin time...Encephalopathy."  (TR. 105)  It is undisputed that an April 30, 2004 needle biopsy of Plaintiff's liver showed mildly active chronic hepatitis C with preserved hepatic architecture. (TR. 442)  Thus, Plaintiff has satisfied subsection F's requirement of "[c]onfirmation of chronic liver disease by liver biopsy."  Section 5.05(F)(3).  However, the next requirement of subsection F relating to "[h]epatic cell necrosis or inflammation persisting for at least 3 months, documented by repeated abnormalities of prothrombin time and enzymes indicative of hepatic dysfunction" is not completely satisfied by Dr. Bakotic's statement because Dr. Bakotic, although  addressing abnormal prothrombin time, does not mention "enzymes indicative of hepatic dysfunction."  Id.  Ultimately, the ALJ discounted Dr. Bakotic's opinion

---

[6]Prothrombin Time "is the most frequently performed coagulation test....Prothrombin times have been standardized according to an International Normalized Ratio (INR), which compares the local thromboplastic reagent against an International Reagent....The INR is most applicable in standardizing anticoagulant intensity independent of variations in different laboratories.  It is therefore only useful in prescribing oral anticoagulants and has no known significance in the patient whose prothrombin time is short or whose prothrombin time is prolonged from causes other than anticoagulant use (i.e. liver disease, malabsorption, or vitamin K deficiency)."  (TR. 161)

and instead accorded greater weight to non-examining Dr. Bahn's opinion that Plaintiff did not meet a Listing.  (TR. 19)

Plaintiff argues that the ALJ's reliance on Dr. Bahn's testimony was improper under *Daubert v. Merrell Dow,* 509 U.S. 579 (1993).  Plaintiff's argument is without merit in light of the Ninth Circuit's holding that *Daubert* does "not govern the admissibility of evidence before the ALJ in the administrative proceeding in [the instant]... Social Security case." *Bayliss v. Barnhart,* 427 F.3d 1211, 1218 n.4 (9th Cir. 2004).  (*See also* discussion *infra,* at pp. 30-31, rejecting Plaintiff's argument that admission of Dr. Bahn's testimony in violation of *Daubert* also violated due process.)

Plaintiff also argues that the ALJ's reliance on Dr. Bahn's testimony over Dr. Bakotic's was improper given the substantial evidence of record and the deference accorded to a treating doctor's opinion. Although a treating doctor's opinion is entitled to great weight, it is well-settled that a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition/impairment or the ultimate issue of disability.  *Batson v. Commissioner*, 359 F.3d 1190, 1195 (9th Cir. 2004); *Magallanes,* 881 F.2d at 751.  Instead, the ALJ may rely on the opinion of a nonexamining, testifying medical advisor such as Dr. Bahn as substantial evidence when that opinion is supported by other evidence in the record and is consistent with same.  *Morgan v. Apfel,* 169 F.3d 595, 600 (9th Cir. 1999).  To accord greater weight to Dr. Bahn's opinion, the ALJ must set out specific and legitimate reasons for rejecting Dr. Bakotic's opinion that Plaintiff was disabled.  *Id.  See also Reddick,*  157 F.3d at 725 ("A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record.")

The ALJ rejected treating Dr. Bakotic's opinion because she found it was "conclusory, based on no treating or examining notes, based on no medical evidence, and contrary to the medical evidence in the record."  (TR. 19) Instead, the ALJ accepted non-examining Dr. Bahn's testimony that Plaintiff did not meet a listing.  (Id.)  She found Dr. Bahn's opinion

"consistent with the objective medical evidence in its entirety and...based on a thorough review of the entire record...." (Id.)

It is undisputed that Dr. Bakotic's May 2005 disability opinion is devoid of citation to supporting medical records. However, the record is clear that Dr. Bakotic began treating Plaintiff in September 2004 and saw Plaintiff approximately monthly thereafter as indicated by Dr. Bakotic's treatment notes. During that time, Plaintiff was also treated by Dr. Mezher. Dr. Mezher informed Dr. Bakotic on more than one occasion that Plaintiff was doing well with Interferon treatment except for complaints of fatigue, nausea, and back pain. (TR. 427 (January 3, 2005: "He is doing relatively well with the Interferon injection, except for significant fatigue" and noting "intermittent...[n]ausea. Likely related to treatment."); TR. 426 (January 24, 2005: (Plaintiff "continues to do well except for some discomfort in the lower back on both sides. He has no other complaints."); TR. 425 (March 14, 2005: "he continues to do well except for complaints of fatigue, nausea, and back pain. He denies any depressive symptoms or rashes or other complaints."); TR. 454 (May 6, 2005: Plaintiff "continues to complain of significant fatigue, weight loss, and inability to work adequately. Otherwise no complaints." ); TR. 453 (August 11, 2005: Plaintiff "continues to do well with no significant side effects except some fatigue."))

Also, during the time Dr. Bakotic treated Plaintiff, Plaintiff underwent lab tests. It is reasonable to conclude that Dr. Bakotic reviewed Plaintiff's lab results. Additionally, on September 24, 2004, Dr. Mezher wrote Dr. Bakotic that Plaintiff's most recent INR[7] was 1.5 (TR. 433); on January 24, 2005, Dr. Mezher wrote Dr. Bakotic that Plaintiff had a slight decrease of his white blood cell count "otherwise [his lab results] were unremarkable" (TR. 426); on May 6, 2005 Dr. Mezher informed Dr. Bakotic of a "mild decrease" in Plaintiff's complete blood count indices (TR. 454) and on August 11, 2005 Dr. Mezher wrote Dr. Bakotic that he had "reviewed [Plaintiff's] labs, which remain in the acceptable range." (TR.

---

[7]The significance of INR results to Plaintiff's case is discussed *infra*, at p.26.

453) The ALJ is correct that Dr. Bakotic's treatment notes indicate routine treatment (TR. 17) and do not specifically discuss Plaintiff's lab reports or whether Plaintiff's hepatitis C, treatment for same, pain, fatigue and nausea affected his ability to work.

Dr. Bahn initially testified that many of Plaintiff's liver function tests were all within normal limits.  (*See* Defendant's Brief, p. 11 (*citing* TR. 566); *see also* TR. 46, 328  (June 2003, April 5, 2004, May 10, 2006 lab reports showing prothrombin time and/or enzymes within normal limits))[8] Later, when questioned by Plaintiff, Dr. Bahn conceded that Plaintiff's October 23, 2003 lab result indicated an abnormal prothrombin time level.  (TR. 570-572)  The lab results reflect that Plaintiff's prothrombin time level was 12.9 and thus, high because the normal range was 8.8 to 12.8.  (TR. 134) Defendant cites Dr. Bahn's testimony that the abnormality was slight and "insignificantly abnormal." (Defendant's Brief, p. 12 (*citing* TR. 573, 575)).

Plaintiff also cites a June 1993 lab report indicating high ALT (normal range: [illegible] to 35; Plaintiff's level: 39) and low lithium levels (normal range: illegible, Plaintiff's level: 0.32) (TR. 91); February 2001 lab reports indicating high SGOT (normal range: 0-40, Plaintiff's level: 51), SGPT (normal range: 0-40, Plaintiff's level: 59),

---

[8]Defendant indicates that "Dr. Bahn cited liver function test dates of June 2003, November 2003, and October 21, 2003, October 23, 2003, April 5, 2004, and April 22, 2004. (T[R]. 328, 323, 363, 370, 567, 579), as showing [p]rothrombin time testing as 'entirely within normal limits.'"  (Defendant's Brief, pp. 16-17) As discussed *infra* the tests dated October 2003 and April 22, 2004 reflected abnormal prothrombin time and/or enzyme abnormal readings.  *(See* Defendant's Brief, p. 12 (acknowledging that Dr. Bahn "later clarified that the October 21 test was slightly, albeit insignificantly abnormal, (TR. 573, 575), and that a report dated October 20, 2003 indicated that Plaintiff's [p]rothrombin time test was "a little bit below the normal.  (T[R]. 571)") The record reflects that Dr. Bahn's testimony concerning October 20, 21 or 23 2003 test results refer to the same test result of October 23, 2003. (*See e.g.* TR. 134-133 (October 23, 2003 test results reflecting: the date of specimen as October 20, 2003, date received as October 21, 2003, and date reported as October 23, 2003)).  Additionally, the parties refer to a November 2003 report. (Defendant's Brief, p. 11; TR. 588 (Plaintiff, at the April 2006 hearing, *citing* TR. 305 (also cited as exhibit 2F/7)). That report merely notes the October 2003 laboratory results.  (*See* TR. 96)

cholesterol (normal range: 50-199, Plaintiff's level: 224)  and triglycerides (normal range: 0-199, Plaintiff's level: 273) (TR. 92-93); an October 1, 2003 note by Dr. Saltzman indicating "an increased serum ammonia level..." (no specific level noted)  (TR. 127); a somewhat illegible March 2004 lab report indicating what appears to be abnormal AST (SGOT) and BUN levels (specific ranges illegible) (TR. 132; *see also* TR. 95 (March 24, 2004 clinic note indicating elevated liver function and BUN tests)); an April 24, 2004 lab report indicating a high prothrombin time level (normal range: illegible to 13.0, Plaintiff's level: 15.7) (TR. 96); and a May 2006 lab report indicating a prothrombin time within normal limits but a low, i.e. abnormal, INR (normal range: 2.0 - 3.5, Plaintiff's level: 1.1) (TR. 146). Other lab reports in the record indicate: high glucose serum (normal range: 65-99, Plaintiff's level: 125), lipase (normal range: 0-59, Plaintiff's level: 99), and cholesterol (normal range: 100-199, Plaintiff's level: 225) in September 2004 (TR. 439-441); low white blood cell counts in December 2004, and January and March 2005.  (TR. 435, 437-438)

With regard to the report indicating an abnormal INR level, Dr. Bahn testified that the INR only applies to patients taking anticoagulants and, thus, "does not mean anything if you are not on anticoagulant blood thinner medication."  (TR. 574) Dr. Bahn stressed that INR did "not apply in this case."  (TR. 579; *see also* TR. 581) There is no evidence that Plaintiff was taking anticoagulants.  Plaintiff contends that "'INR applies to patients on anticoagulant therapy' [too.]" (Plaintiff's Brief, p. 8) (internal quotations and brackets in original) He also points out that treating Dr. Mezher noted INR results in September 2004.[9]  (TR. 433) However, Dr. Bahn's testimony is supported by the literature of record (*see* TR. 161 & n.6 *supra*) and the face of the lab report which indicates that "INR reference interval applies to patients on anticoagulant therapy."  (TR. 152) There was no testimony before the ALJ regarding specific enzyme levels or abnormal results discussed above other than those

_____

[9]The ALJ noted that treating Dr. Mezher's "notes through August 2005 show the claimant doing well "'with no significant side effects except some fatigue.'" (TR. 17)

relating to prothrombin time and INR.  However, Dr. Bahn testified that enzyme levels would improve "[o]nly if the hepatitis is under control...only if there is improvement in the liver function, in the liver itself."  (TR. 571)

In sum, the record reflects that after Plaintiff's alleged December 2001 onset date: Plaintiff's enzyme levels were normal (no mention of prothrombin time) in June 2003; Dr. Saltzman noted Plaintiff's ammonia serum was abnormal (no level indicated) on October 1, 2003; Plaintiff's ammonia serum level was back to normal on October 23, 2003 but his prothrombin time was abnormal (normal range: 8.8-12.8, Plaintiff's level: 12.9); his enzymes were abnormal (specific results illegible) (no mention of prothrombin time) in March 2004; his prothrombin time was normal (normal range: 8.8-13.0, Plaintiff's level: 12.3) on April 5, 2004, but by April 24, 2004 it was abnormal (normal range: illegible to 13.0, Plaintiff's level: 15.7) (no mention of enzymes in either April 2004 report); and his enzymes were normal, his glucose serum was high (normal range: 65-99, Plaintiff's level: 125), lipase was high (normal range: 0-59, Plaintiff's level: 99), and cholesterol was high (normal range: 100-199, Plaintiff's level: 225) (no mention of prothrombin time) in September 2004. Additionally, after Plaintiff began Interferon treatment in 2005, treating Dr. Mezher indicated that, except for low blood count indices, Plaintiff's lab results were unremarkable and within acceptable ranges.

It is troubling that Plaintiff's treating doctor and the non-examining doctor came to such diverse conclusions based upon apparently the same lab records. Defendant persuasively argues that "isolated abnormal tests [reflected in the record] simply do not establish that these abnormal levels either: 1) existed for [sic] three month period; or 2) evidenced hepatic dysfunction." (Defendant's Brief, p. 12) Dr. Bahn testified that it was "unknown" whether Plaintiff's mild cell necrosis lasted more than three months.  (TR. 560) He also testified that the April 2004 biopsy showed "preserved hepatic architecture...that means it's still in reasonably good shape."  (TR. 565)  In his opinion, Plaintiff's October 2003 abnormal prothrombin time result was "not significant" given that Plaintiff's result was

12.9 and the "[u]pper limit of normal is up to 12.8." (TR. 575) Dr. Bahn concluded that "many" of the lab results showed Plaintiff's prothrombin time and enzyme results were normal. (TR. 566)  He pointed out that after Plaintiff began Interferon treatment, his liver function tests improved. (TR. 561-562) He also pointed out that improved enzyme levels signify "improvement in liver function, in the liver itself."  (TR. 571) Consistent with Dr. Bahn's testimony, neither Dr. Mezher nor Dr. Bakotic indicated abnormal liver function tests after Plaintiff began treatment. Nor do Dr. Mezher's or Dr. Bakotic's treatment records discuss  hepatic dysfunction.  Instead, on the three occasions that Dr. Mezher discussed lab results, he indicated no abnormalities concerning prothrombin time or enzyme levels.  Based on the evidence of record, Dr. Bahn testified that Plaintiff did not meet the listings.

Where "a nontreating source's opinion contradicts that of the treating physician but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Andrews,* 53 F.3d 1035, 1041 (9th Cir. 1995) (*citing Magallanes,* 881 F.2d at 751, 755; *Ramirez v. Shalala,* 8 F.3d 1449, 1453 (9th Cir. 1995)); *see also Batson,* 359 F.3d at 1195 ("an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole...or by objective medical findings").  The ALJ herein properly rejected treating Dr. Bakotic's opinion as contrary to the medical evidence of record as a whole, conclusory, and unsupported by his own treatment notes.

With regard to Plaintiff's argument that his impairment equals a listing (*See* Plaintiff's Brief p. 14 (*citing* 20 C.F.R. § 404.1527)), the substantial evidence of record supports the ALJ's conclusion that no physician of record indicated findings that would satisfy the severity requirements to equal a listing. (TR. 18)  In October 2003, Dr. Saltzman expressed concern that Plaintiff's increased serum ammonia level signified that Plaintiff had advanced hepatic dysfunction.  (TR. 127) However, the April 2004 liver biopsy, which Dr. Saltzman recommended, ruled out such a conclusion.  (TR.  442; *see also* TR. 341 (December 2003

CT scan, also ordered by Dr. Saltzman, "was entirely within normal limits.") Instead, the finding was mildly active chronic hepatitis C and preserved hepatic architecture. (TR.442) Additionally, as discussed above, although Dr. Bakotic ultimately opined that Plaintiff was unable to work, his treatment notes do not in any way reflect the severity of Plaintiff's condition.   Nor do treating Dr. Mezher's notes support a finding that Plaintiff's condition was equivalent to a listing under section 404.1527.  Although Dr. Mezher noted Plaintiff's complaints of significant fatigue and other side effects to Interferon treatment, Dr. Mezher repeatedly stated that Plaintiff continued to do well and that his lab results were within normal range except for some low white blood count indices.  Neither Dr. Bakotic nor Dr. Mezher noted symptoms, signs or laboratory findings "at least in equal severity and duration" to the characteristic of a relevant listed impairment. *Tackett,* 180 F.3d at 1099.

The ALJ further supported her determination by pointing out that Plaintiff's hepatitis was mild and chronic; "Plaintiff's hearing loss is correctable with hearing aids which the claimant himself acknowledges allow him to hear almost normally.  The evidence mentions degenerative disk disease, but there are no x-rays or magnetic resonance imaging (MRI) studies in the record.  His chronic obstructive pulmonary disease is mild.  The claimant's [I]nterferon treatment has finished."  The substantial evidence of record supports the ALJ's conclusions.

Further, Plaintiff's reliance on prison "no-work" orders from December 1992 (TR. 334) and August 2003 (TR. 300) is unavailing given that the authorizing doctors stated no basis for their decision.   Nor is there is indication that the  criteria for a no-work order is synonymous with a finding of disability under the Social Security Act.

### 2.      Constitutional Claims

Plaintiff also argues that his due process rights have been violated.  He asserts that under the   "substantial evidence" standard "it's frankly impossible to receive notice of precisely, or even generally, how much evidence is needed to overcome Commissioner's ridiculously (and unconstitutionally) low burden of winning due to 'substantial evidence'

burden on Government (S[ocial] S[ecurity] A[dministration]).” (Plaintiff's Brief, p. 16) He also asserts that the admission of Dr. Bahn's testimony was unconstitutional in light of *Daubert.*

Defendant argues that Plaintiff's claims are conclusory and, thus, not meritorious of review. Generally, an attack of the merits of the ALJ's decision is not sufficient to establish a constitutional violation. *See Evans v. Chater,* 110 F.3d 1480, 1482 (9th Cir. 1997) Instead, the constitutional claim must implicate a due process right to a meaningful opportunity to be heard or to seek reconsideration of an adverse benefits determination. *Id.* at 1482-1483. Because Plaintiff's claims herein specifically address the hearing process, the Court will address them.

The substantial evidence standard is the quantum of evidence necessary to support the ALJ's decision. Contrary to Plaintiff's argument that the standard lacks definition, this standard “can be meaningfully defined. *See, e.g., In re Transcon Lines,* 89 F.3d 559, 564 (9th Cir. 1996) (‘Substantial evidence means more than a mere scintilla but less than a preponderance; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.’)” *Kim v. U.S.,* 121 F.3d 1269, 1276 (9th Cir. 1997). Further, the standard has been defined in the specific context of social security disability cases:

> “more than a scintilla,” *Richardson v. Perales,* 402 U.S. 389, 401...(1971), but “less than a preponderance.” *Sorenson v. Weinberger,* 514 F.2d 1112, 1119 n.10 (9th Cir. 1975)...Substantial evidence is “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” *Richardson,* 402 U.S. at 401...

*Smolen v. Chater,* 80 F.3d 1273, 1279 (9th Cir. 1996).

Additionally, with regard to Plaintiff's *Daubert* claim, it is well settled that “[t]he Federal Rules of Evidence do not apply to the admission of evidence in Social Security administrative proceedings.” *Bayliss,* 427 F.3d at 1218, n.4 (citations omitted) *See also* 42 U.S.C. (b)(1); 20 C.F.R. §§ 404.950(c), 416.1450(c) (“The administrative law judge may receive evidence at the hearing even though the evidence would not be admissible in court

under the rules of evidence used by the court."). The United States Supreme Court has acknowledged that Congress granted the Commissioner of Social Security the authority "to establish procedures and to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order establish the right to benefits, and to receive evidence even though inadmissible under rules of evidence applicable to court procedure...The matter comes down to the question of the procedure's integrity and fundamental fairness." *Richardson,* 402 U.S. at 409–410 (internal quotation marks omitted) (no due process violation at social security disability proceeding "in the admission of consultants' reports, subject as they are to being material and to the use of the subpoena and consequent cross-examination" without regard to rules of evidence)  Pointing out that "the *Daubert* decision rests on an interpretation of Federal Rule of Evidence 702,..." the Ninth Circuit has held that *Daubert* "does not govern the admissibility of evidence before the ALJ in the administrative proceeding in this Social Security case." *Bayliss,* 427 F.3d at 1218 n. 4.  Accordingly, the ALJ's alleged failure to  comply with *Daubert* when admitting Dr. Bahn's testimony is of no moment.  *See Richardson,* 402 U.S. at 400 ("Strict rules of evidence, applicable in the courtroom, are not to operate at social security hearings so as to bar the admission of evidence otherwise pertinent....") The record reflects that Dr. Bahn testified at the April 2006 hearing and that Plaintiff received and availed himself of the opportunity to cross-examine him.[10]   Given that the rules of evidence do not apply to the instant administrative proceedings, the ALJ's alleged failure to comply with *Daubert* is without constitutional significance.  *See e.g. Richardson,* 402 U.S. 398.

---

[10]The record also reflects that Plaintiff interrupted Dr. Bahn's direct examination to ask questions.  The record further reflects that the ALJ stated during Plaintiff's cross-examination of Dr. Bahn that Plaintiff was "not giving [Dr. Bahn] an adequate opportunity to answer the questions...I am required to allow him [i.e. Plaintiff] to question you [i.e. Dr. Bahn].  I'm giving you [i.e. Plaintiff] ten more minutes, sir, and that's it." (TR. 573; *see also* TR. 560-561, 565 (ALJ directing Plaintiff to allow Dr. Bahn to fully answer Plaintiff's questions))

Plaintiff's constitutional arguments are without merit.

V.     CONCLUSION

The Magistrate Judge does not discount the seriousness of Plaintiff's diagnoses of record, including that of hepatitis C.  However, review of the record reflects that the ALJ applied the proper legal standard to accept Dr. Bahn's findings over Dr. Bakotic's opinion and that Plaintiff's claims of due process violations are without merit.

VI.     RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review deny Plaintiff's request for benefits and dismiss this action.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CV 07-131-TUC-DCB**.  A party may respond to another party's objections within ten days after being served with a copy thereof.  *See* Fed.R.Civ.P. 72(b).    If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 12th day of June, 2008.

_____

Héctor C. Estrada
United States Magistrate Judge